No. 20-00033

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

_____

In re GINA MARIE MILNER, Debtor.

_____

B. DAVID SISSON, Appellant,

v.

UNITED STATES TRUSTEE, Appellee.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

_____

**BRIEF OF APPELLEE, ILENE J. LASHINSKY, UNITED STATES TRUSTEE**

_____

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
Trial Attorney

Department of Justice
Executive Office for
  United States Trustees
441 G Street, NW,
Suite 6150
Washington, DC 20530
Tel: (202) 307-1399
E-mail: beth.a.levene@usdoj.gov

ILENE J. LASHINSKY
United States Trustee for Region 20
CHARLES S. GLIDEWELL
Assistant United States Trustee
MARJORIE CREASEY
Trial Attorney

Department of Justice
Office of the United States Trustee
215 Dean A. McGee Ave., Room 408
Oklahoma City, OK 73012
Tel: 405-231-4393
E-mail: marjorie.creasey@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................................iii

STATEMENT OF APPELLATE JURISDICTION........................................................1

STATEMENT OF THE ISSUES ..................................................................................1

STANDARD OF REVIEW...........................................................................................1

STATEMENT OF THE CASE ......................................................................................2

    A.    Mr. Sisson's Practice and His Relationship with Fresh Start. ...........................3

    B.    Mr. Sisson Charges Ms. Milner $2,700, Instead of His Usual $1,500, Because She Cannot Pay Up Front. ...................................................................4

        1.    The Pre-Petition Contract ..........................................................................5

        2.    The Post-Petition Contract.........................................................................8

        3.    The Fresh Start Consent .............................................................................8

        4.    Mr. Sisson Files Required Court Disclosures Regarding His Compensation. ...........................................................................................9

            a.  The Initial Disclosure.........................................................................9

            b.  The Amended Disclosure.................................................................10

        5.    Ms. Milner's Bankruptcy Case Is Straightforward..................................12

    C.    The United States Trustee Seeks Court Review of Mr. Sisson's Fee..............12

    D.    After Conducting an Evidentiary Hearing, the Bankruptcy Court Reduces Mr. Sisson's Fee by $800—to $1,900. ...........................................................13

        1.    The bankruptcy court found that Mr. Sisson did not establish his fees were reasonable....................................................................................15

        2.    The bankruptcy court found that Mr. Sisson's required disclosures to the court were "incorrect and misleading." ............................................16

        3.    The bankruptcy court found that Mr. Sisson's fee agreements did not comply with the Code's disclosure requirements. ............................17

SUMMARY OF THE ARGUMENT .............................................................................19

ARGUMENT.................................................................................................................20

I.     The Bankruptcy Court Did Not Abuse Its Discretion in Finding that Mr. Sisson's $2,700 Fee Was Unreasonable.................................................................20

II.    Alternatively, the Bankruptcy Court Did Not Clearly Err in Finding that Mr. Sisson's Disclosures Did Not Comply with Section 329 and Bankruptcy Rule 2016. ........................................................................................................................23

III.    Alternatively, the Bankruptcy Court Did Not Clearly Err in Finding that the Fee Agreements Were Not Clear and Conspicuous. .............................................. 27

CONCLUSION .............................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of Bessemer City*,
    470 U.S. 564 (1985) ................................................................................................ 2

*Conn. Bar Ass'n v. U.S.*,
    620 F.3d 81 (2d Cir. 2009) ................................................................................... 27

*U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. The Village at Lakeridge, LLC*,
    138 S. Ct. 960 (2018) ............................................................................................ 1

*In re Geraci*,
    138 F.3d 314 (7th Cir. 1998) ..................................................................... 2, 21, 22

*Gillman v. Ford (In re Ford)*,
    492 F.3d 1148 (10th Cir. 2007) ............................................................................ 2

*Gillman v. Scientific Research Prods. (In re Mama D'Angelo)*,
    55 F.3d 552 (10th Cir.1995) ................................................................................. 2

*In re Hazlett*,
    Case No. 16-30360, 2019 WL 1567751 (Bankr. D. Utah Apr. 10, 2019) .................. 14

*Henderson v. Kisseberth (In re Kisseberth)*,
    273 F.3d 714 (6th Cir. 2001) .............................................................................. 24

*Hessinger & Assocs. v. U.S. Trustee (In re Biggar)*,
    110 F.3d 685 (9th Cir. 1997) .......................................................................... 3, 27

*Houlihan Lokey Howard & Zukin Capital v. Unsecured Creditors' Liquidating Trust (In re Comm. Fin. Servs.)*,
    427 F.3d 804 (10th Cir. 2005) ................................................................... 2, 21, 22

*Jensen v. United States Trustee (In re Smitty's Truck Stop, Inc.)*,
    210 B.R. 844 (B.A.P. 10th Cir. 1997) ................................................................ 24

*Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*,
    103 F.3d 472 (6th Cir. 1996) .............................................................................. 25

*Milavetz, Gallop & Milavetz, P.A. v. U.S.*,
    559 U.S. 229 (2010) ............................................................................................ 27

*Neben v. Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*,
 63 F.3d 877 (9th Cir. 1995) .................................................................. 24, 25

*In re Robinson*,
 368 B.R. 492 (Bankr. E.D. Va. 2007) ........................................................ 30

*In re Rodriguez Perez*,
 No. 15-06593 (ESL), 2018 WL 3655656 (Bankr. D.P.R. July 31,
 2018) ........................................................................................ 27, 28, 29, 30

*SE Prop. Holdings, LLC v. Stewart (In re Stewart)*,
 600 B.R. 425 (B.A.P. 10th Cir. 2019) .......................................................... 1

*In re Seare*,
 515 B.R. 599 (B.A.P. 9th Cir. 2014) ........................................................... 29

*Snyder v. Dewoskin (In re Mahendra)*,
 131 F.3d 750 (8th Cir. 1997) ................................................................ 21, 23

*In re Stewart*,
 583 B.R. 775 (Bankr. W.D. Okla. 2018) ..................................................... 25

*Turner v. Davis, Gillenwater & Lynch*,
 4 F.3d 1556 (10th Cir. 1993) ..................................................................... 24

*In re Winstar Comms., Inc.*,
 378 B.R. 756 (Bankr. D. Del. 2007) ....................................................... 24, 26

**Statutes**

11 U.S.C. § 101 ............................................................................................ 18

11 U.S.C. § 102(3) ....................................................................................... 21

11 U.S.C. § 307 ............................................................................................ 12

11 U.S.C. § 329 ..................................................................................... *passim*

11 U.S.C. § 330 ................................................................................ 21, 22, 23

11 U.S.C. § 523 .......................................................................................... 3, 27

11 U.S.C. § 526 ........................................................................ 12, 17, 18, 27

11 U.S.C. § 528 ..................................................................................... *passim*

11 U.S.C. § 727(b) ............................................................................................ 3, 27

28 U.S.C. § 157 .................................................................................................... 1

28 U.S.C. § 158 .................................................................................................... 1

28 U.S.C. §§ 581-589 ......................................................................................... 12

28 U.S.C. § 1334(a) .............................................................................................. 1

**Other Authorities**

Fed. R. Bankr. P. 2016 ................................................................................. *passim*

Fed. R. Bankr. P. 2017 ....................................................................................... 12

Fed. R. Bankr. P. 8002 ......................................................................................... 1

Merriam–Webster Online *available at* http:// www.merriam-webster.com .................... 26

## STATEMENT OF APPELLATE JURISDICTION

This Court has jurisdiction to hear this appeal under 28 U.S.C. § 158(a)(1), which grants district courts jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges.

The bankruptcy court had jurisdiction over the debtor's chapter 7 bankruptcy case under 28 U.S.C. §§ 157(a) and (b), and 1334(a).  The bankruptcy court's final order was entered on December 12, 2019.  *See SE Prop. Holdings, LLC v. Stewart (In re Stewart)*, 600 B.R. 425, 431 (B.A.P. 10th Cir. 2019).  Appellant timely filed a notice of appeal under 28 U.S.C. § 158(c)(2) and Fed. R. Bankr. P. 8002 on December 23, 2019.

## STATEMENT OF THE ISSUES

This Court should affirm if the answer to any one of the following questions is no.

(1)     Did the bankruptcy court abuse its discretion in determining that Appellant's $2,700 attorney fee was excessive and awarding $1,900 instead, when his usual fee was $1,500 and the average fee in the area for similar cases was $1,200-$1,400?

(2)     Did the bankruptcy court clearly err in finding Appellant's required fee disclosures to the court were inaccurate and incomplete?

(3)     Did the bankruptcy court clearly err in finding Appellant's fee agreements did not "clearly and conspicuously" disclose his fees, services, and terms of payment?

## STANDARD OF REVIEW

The bankruptcy court's conclusions of law are reviewed *de novo*, and its findings of fact for clear error.  *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. The Village at Lakeridge, LLC*, 138 S. Ct. 960, 965–66 (2018).  Where a mixed question of law and fact requires the court to consider facts as a whole and to balance them against each other, appellate review is for clear error.  *Id*. at 968.

Under the clearly erroneous standard, the appellate court "accept[s] the ultimate factual determinations of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *Gillman v. Ford (In re Ford)*, 492 F.3d 1148, 1154 (10th Cir. 2007) (quoting *Gillman v. Scientific Research Prods. (In re Mama D'Angelo)*, 55 F.3d 552, 555 (10th Cir.1995)).  Credibility findings are given particular deference, and "can virtually never be clear error." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985); *see also In re Ford*, 492 F.3d at 1157.

Judicial review of a bankruptcy court's factual determinations in connection with fee awards "is highly deferential," *Houlihan Lokey Howard & Zukin Capital v. Unsecured Creditors' Liquidating Trust (In re Comm. Fin. Servs.)*, 427 F.3d 804, 810 (10th Cir. 2005) (internal quotation marks omitted), and should be reversed only if the appellate court is "convinced that no reasonable person could agree with the bankruptcy court," *In re Geraci*, 138 F.3d 314, 319 (7th Cir. 1998).

## STATEMENT OF THE CASE

The debtor in this case, Gina Marie Milner, is a low-wage single mother that had expenses exceeding her income by over $700 per month.  She had an immediate desire to file for bankruptcy because of an impending wage garnishment of $500 per month.

Appellant, B. David Sisson, is a bankruptcy attorney who usually charges a $1,500 or $1,800 flat fee for a chapter 7 bankruptcy case.  He testified that the average flat fee in the area for a chapter 7 case is between $1,200 and $1,400.  Because Ms. Milner did not have the money to pay Mr. Sisson in full before he filed her bankruptcy petition, he charged her $2,700:  $300 paid up front and the balance in installments of $200 per month.  Mr. Sisson now appeals the bankruptcy court's reduction of his fee to $1,900—

2

which is still more than both his usual fee and the average fee in the area—based on the court's finding that $2,700 was excessive and that Mr. Sisson violated the Bankruptcy Code's disclosure requirements to the court and his client.

### A.   Mr. Sisson's Practice and His Relationship with Fresh Start.

Mr. Sisson routinely files chapter 7 cases. He testified that he usually charges an $1,800 flat fee, but he offers a discounted fee of $1,500 if a debtor can provide all documents within 30 days. Transcript of Oct. 2, 2019 Hearing ("Tr.") at 120-21.[1] He testified that he charges the $1,500 fee in about 25% of his cases, but his case filings from January 1 through April 30, 2019 show that he charged the $1,500 fee in 79.5% of his cases. *Id.* at 120-21, 163; Bankruptcy Court's Dec. 12, 2019 Opinion ("Op.") at 4.

A debtor who successfully concludes a chapter 7 case receives a discharge of all pre-petition debt, except for certain debts that are not dischargeable. 11 U.S.C. §§ 523, 727(b). Thus, if a chapter 7 debtor agreed pre-petition to pay attorney fees but does not fully pay before the filing of the bankruptcy petition, the debt for the unpaid fees is discharged. *Hessinger & Assocs. v. U.S. Trustee (In re Biggar)*, 110 F.3d 685, 688 (9th Cir. 1997). For this reason, Mr. Sisson uses bifurcated fee agreements—one agreement for pre-petition fees and a second agreement for post-petition fees—for chapter 7 debtors who are unable to pay the full amount before filing but want to file quickly. Tr. at 18-19. Because any debts incurred pre-petition are discharged in bankruptcy, the post-petition agreement is intended to provide a mechanism to create a payment obligation that is not discharged. Tr. at 70-71, 95-96, 106-07; UST Ex. 8 ¶¶ 2, 5.

Under an agreement with Fresh Start Funding, Inc. ("Fresh Start") Mr. Sisson

---

[1] All cited documents are part of the record on appeal transmitted under Docket No. 8.

obtained a $100,000 line of credit.  UST Ex. 7 ¶ 1.  Mr. Sisson receives an advance under

the line of credit of 75% of fees due under post-petition fee agreements approved by

Fresh Start.  *Id*. ¶ 2.  As collateral for the line of credit, Mr. Sisson assigns Fresh Start the

entire amount of all accounts receivable from approved post-petition fee agreements, *id*

¶ 2.4, thus allowing Fresh Start to retain 25% of the post-petition amount.  *Id*. ¶¶ 2, 2.4,

5.3; Tr. at 49.  Mr. Sisson receives 60% of the fees once Fresh Start approves a post-

petition agreement, but Fresh Start retains 15% of the fees in a holdback account as

security if a client fails to pay.  UST Ex. 7 ¶¶ 2.1, 2.2; Tr. at 45.  For approved post-

petition contracts, Mr. Sisson's client pays Fresh Start directly, and Fresh Start manages

collections.  Tr. at 44; *see also* UST Ex. 7 ¶ 1.  If any non-payment is not satisfied

through the holdback, Fresh Start has the right to pursue collection directly against the

client.  UST Ex. 7 ¶ 5.4.  Fresh Start will report a client's payments or non-payment to

credit reporting agencies.  *Id*. ¶ 6.3.

### B.    Mr. Sisson Charges Ms. Milner $2,700, Instead of His Usual $1,500, Because She Cannot Pay Up Front.

Ms. Milner works in a prison cafeteria.  Tr. at 17.  She is a single mother raising

two sons and two nieces, all under the age of 12.  *Id*.; UST Ex. 4 at 24.  When she filed

for bankruptcy, Ms. Milner had a net monthly income of $2,061.62, consisting of

$1,757.62 in wages and $304.00 in SNAP benefits.  UST Ex. 4 at 22-23.  Based on this

income, Ms. Milner was below the federal poverty level.  Tr. at 69.  Her monthly

expenses exceeded her income by $794.24 per month.  UST Ex. 4 at 22-25; Tr. at 69-70.

Ms. Milner contacted Mr. Sisson on April 16, 2019.  She was extremely distressed

because of an imminent wage garnishment of $500 per month resulting from a lawsuit.

Tr. at 17-18, 21, 37-38.  Mr. Sisson offered Ms. Milner two different flat fee options:

4

(1) $1,800 that she could pay over time, but would have to pay before the petition was filed; or (2) a bifurcated option in which she would pay $300 pre-petition and $2,400 paid over time post-petition, for a total fee of $2,700.  Tr. at 39, 59, 123-24.  For both options, Ms. Milner would also have to pay the $335 filing fee up front.  *Id*.  Mr. Sisson testified that he does not recall whether he presented Ms. Milner with the option to pay his discounted $1,500 rate if she paid and provided all of her documentation within thirty days, although he testified he typically would do so.  Tr. at 139-141.

During their meeting, Mr. Sisson gave Ms. Milner two unsigned contracts:  one for pre-petition services ("Pre-Petition Contract") and one for post-petition services ("Post-Petition Contract").  Tr. at 19-20, 22; UST Exs. 8, 9.  Mr. Sisson told Ms. Milner that the bifurcated contract option would be more expensive, but Ms. Milner felt that she had no choice as she could not afford to pre-pay the entire fee and did not have time to save up enough money because of the impending garnishment.  Tr. at 19, 20-21, 28-29, 124.  Mr. Sisson could not recall if he considered filing for an undue hardship exemption in the garnishment proceeding.  Tr. at 71-72.

Based on her income and expenses, Mr. Sisson knew that Ms. Milner's expenses would exceed her income by at least a $500 per month.  Tr. at 125-26.  Yet Mr. Sisson could not recall whether he told Ms. Milner that she could not afford an additional $200 per month for his fees.  *Id*.  Mr. Sisson did recall that he did not suggest Ms. Milner contact Legal Aid or a less expensive attorney—even though the average fee for a chapter 7 case in the Oklahoma City area is between $1,200 and $1,400.  Tr. at 60, 67, 72.

### 1.    The Pre-Petition Contract

Ms. Milner returned to Ms. Sisson's office the next day, April 17, 2019, with the signed Pre-Petition Contract.  Tr. at 21-22; UST Ex. 8.

5

Mr. Sisson's Pre-Petition Contract contains several provisions that are not clear. For example, it states that if Ms. Milner enters the Post-Petition Contract, she will be required to pay attorneys' fees of $2,400 in installments totaling $200 per month, which "will be paid in weekly or bi-weekly, or monthly, or semi-monthly installments of totally [sic] $200.00 per month until paid in full." *Id.* ¶ 4(a). The Pre-Petition Contract requires Ms. Milner to represent that "even if my expenses exceed my income as shown in the bankruptcy statements and schedules, I believe that I am able to make the [post-petition] payments contemplated by this agreement." UST Ex. 8 ¶ 4. The Pre-Petition Contract further provides: "I acknowledge and agree that bifurcating my case creates additional work and costs for the Law Firm and that this results in the Law Firm charging me an additional fee of $900.00 that I would not have had to pay if I paid the $335.00 filing fees and $1,800 retainer of my Bankruptcy prior to the case being filed." *Id.* ¶ 1. There is no description of what additional work or costs are required because of bifurcation.

The Pre-Petition Contract describes the services that Mr. Sisson will provide pre-petition and through a Post-Petition Contract, but states that neither "will include adversary proceedings or contested matters." UST Ex. 8 ¶¶ 2, 4. No description of what these are is provided. *Id.*

The Pre-Petition Contract further states that Mr. Sisson's "contractual responsibilities will end upon completion of the filing of my bankruptcy case." UST Ex. 8 ¶¶ 2, 4. It stresses "that there remains important post-petition legal work necessary to finish my bankruptcy case and receive a discharge, that much of that work must be completed within 14 days from the filing of the petition, and that if the work is not completed my case will be dismissed and I will not receive a discharge of my debts." UST Ex. 8 ¶ 4. The Pre-Petition Contract describes three "Post-Petition Options":

6

proceeding pro se, proceeding with other legal counsel, or retaining Mr. Sisson.  *Id.*

At the same time, the Pre-Petition Contract advises that Mr. Sisson "will remain professionally obligated to serve as counsel for me in the case until and unless the Bankruptcy Court allows [him] to formally withdraw."  *Id.*  Mr. Sisson did not discuss with Ms. Milner when the court might allow him to withdraw as her counsel if she did not enter the Post-Petition Contract, Tr. at 90, although he admitted in his testimony that he thought the court probably would not allow him to withdraw, Tr. at 168.  Mr. Sisson testified that debtors like Ms. Milner do not understand the distinction between his contractual obligation and his professional responsibility to continue to represent her if she did not sign the Post-Petition Contract.  Tr. at 90-91.

Similarly, Mr. Sisson included a conflicts-of-interest waiver.  The waived conflicts include that his desire to enter a post-petition agreement "may create a conflict of interest" because a post-petition agreement to make payments that will not be discharged in bankruptcy may not be in Ms. Milner's best interests.  *Id.* ¶ 5; *see also* Tr. at 94-95.  In addition, "if" Mr. Sisson obtains financing from Fresh Start and assigns Ms. Milner's obligations to it, that may "place [Mr. Sisson] in conflict with you."  UST Ex. 8 ¶ 5.  Mr. Sisson testified that he didn't know if Ms. Milner understood these provisions.  Tr. at 148.  He testified that, in general, most chapter 7 debtors are not sophisticated and the bankruptcy process must be explained in simple terms.  Tr. at 147-48; *see also* Tr. at 180.

Mr. Sisson's Pre-Petition Contract goes on to state that he uses a line of credit from Fresh Start and that he may assign any Post-Petition Contract account receivable to Fresh Start.  *Id.* ¶ 4.  Mr. Sisson testified that he does not recall if he discussed with Ms. Milner the fact that Fresh Start could pursue collection actions against her if she did not pay the fees.  Tr. at 82.  The Pre-Petition Contract does not disclose that Mr. Sisson

allows Fresh Start to retain 25% of the post-petition fee.

### 2.    The Post-Petition Contract.

Ms. Milner signed a Post-Petition Contract, which is dated April 18, 2019.  The Post-Petition Contract contains many of the same provisions as the Pre-Petition Contract, including the representation that Ms. Milner is able to make the $200 per month payments even if her expenses exceed her income, an acknowledgement that entering the agreement may not be in Ms. Milner's best interests, and a waiver of any conflicts of interest.  UST Ex. 9 ¶¶ 1, 2.  It also provides that if Ms. Milner does not pay the agreed fees, Mr. Sisson "or a third party may commence legal proceedings for collection," and if collection procedures become necessary, Ms. Milner agrees to pay all reasonable costs, including attorney's fees.  *Id.* ¶ 1.

### 3.    The Fresh Start Consent

Ms. Milner also signed a Recurring Payment Authorization and Consent Form ("Fresh Start Consent"), which authorized Mr. Sisson and Fresh Start to automatically debit her debit card $200 monthly, starting on May 20, 2019.  UST Ex. 10.  The Fresh Start Consent is dated April 17, 2019, the date the petition was filed.  *Id.*[2]

The Fresh Start Consent states that Ms. Milner is giving her consent to Mr. Sisson assigning the account receivable associated with her fee agreement to Fresh Start, and "acknowledg[es] [that] my payments would then be made directly" to Fresh Start.  UST Ex. 10.  She further consents to being contacted directly by Fresh Start and acknowledges

---

[2] The handwritten dates on all three documents—the Pre-Petition Contract, the Post-Petition Contract, and the Fresh Start Consent—appear to be in the same handwriting. UST. Ex. 8 at 5, Ex. 9 at 4, Ex. 10 at 1.  Mr. Sisson testified that Ms. Milner signed both the Post-Petition Contract and the Fresh Start Consent on April 18, 2019, although he didn't know if Ms. Milner wrote the dates in herself.  Tr. at 22-23, 76, 137-38.

that Fresh Start may report on-time or late payments to credit bureaus. *Id.*

The fine print below Ms. Milner's signature states that if a payment does not process, Fresh Start may continue to process the payment multiple times and Ms. Milner will be charged $25 each time a payment doesn't clear. *Id.* It further states that "this authorization may not be cancelled unless I dispute the amount of fees owed to the Law Firm, in which case I will contact the Law Firm to resolve the issue." *Id.*

### 4. Mr. Sisson Files Required Court Disclosures Regarding His Compensation.

#### a. The Initial Disclosure

On April 17, 2019, the same day that Mr. Sisson filed Ms. Milner's bankruptcy petition, he filed his mandatory Disclosure of Compensation for Debtor(s), Fed. R. Bankr. P. Official Form 2030 ("Initial Disclosure"). UST Ex. 3, at 12-13. The Bankruptcy Code requires Mr. Sisson to fully and accurately disclose his fees because bankruptcy courts must review all fees and adjust them as necessary. 11 U.S.C. § 329(a) and (b); Fed. R. Bankr. P. 2016. Mr. Sisson represented that Fresh Start provided him training, guidelines, and specific language to use on the disclosure form. Tr. at 42, 136.

Mr. Sisson made a number of statements in the Initial Disclosure indicating he already had entered an agreement to represent Ms. Milner post-petition. Mr. Sisson stated that he has "agreed to accept" $3,035.00 for legal services. *Id.* at 12 ¶ 1. He also told the court he received $635.00, including the filing fee, and that the balance due is $2,400. *Id.* Mr. Sisson further represented that he and Ms. Milner "have entered" two separate fee agreements: the first "was for $635," "signed pre-petition," for the filing of the petition and other "typical matters" that are required to be performed pre-petition; the second "was for $2,400," "signed post-petition," for other legal services including

completion of Ms. Milner's schedules and attending the meeting of creditors.  *Id*. at 12
¶ 5(d).  Mr. Sisson told the court that he "agreed to render legal services for all aspects of
the bankruptcy case," including a number of services that are provided post-petition, such
as filing Ms. Milner's schedules and attending the meeting of creditors.  *Id*. ¶ 5(a)-(c).

      While Mr. Sisson mentions that he has a line-of-credit agreement, he does not
disclose with whom or that Fresh Start retains 25% of the post-petition fee.  Instead, he
states that the source of his compensation is Ms. Milner and that he has not agreed to
share this compensation.  *Id*. at 12 ¶¶ 2-4.  Mr. Sisson states:  "Counsel is able to draw
funds under its line of credit in an amount up to 75% of the post-petition fees so long as it
assigns the post-petition receivable to the lender, in which event the lender will manage
the account receivable in accordance with the terms of the line of credit agreement."  *Id*.
¶ 5(d).  Mr. Sisson states that this line of credit "will allow the Debtor(s) to make
payments for up to 12 months post-petition."  *Id*. at 12 ¶ 4.

      Mr. Sisson does not disclose that Ms. Milner will be making payments directly to
Fresh Start, that Fresh Start will retain $600 of the compensation, that Fresh Start can
pursue collection actions directly against Ms. Milner if she doesn't pay, that the Post-
Petition Contract was not yet signed or that Mr. Sisson will move to withdraw if Ms.
Milner does not sign it.  *See id*.; Tr. at 108, 127-28.

### b.    The Amended Disclosure

      On April 22, 2019, based on the language in the Initial Disclosure indicating that
both the Pre- and Post-Petition Contracts were entered before the petition was filed, the
United States Trustee asked Mr. Sisson for copies of those contracts and the line of credit
agreement.  UST Ex. 5A and 5B; Tr. at 74-75.

      Subsequently, on April 30, 2019, Mr. Sisson filed an Amended Disclosure of

Compensation for Debtor(s), Form 2030 ("Amended Disclosure").  UST Ex. 6.  Mr. Sisson testified that he did not file the amended form because of the United States Trustee's inquiry but because he received updated language from Fresh Start and because the Initial Disclosure did not adequately explain the line of credit or the timeline of when the two contracts were signed.  Tr. at 31-32, 136-37.

Unlike his statements in the Initial Disclosure suggesting that he already had entered into a post-petition fee agreement with Ms. Milner, Mr. Sisson expressly states in the Amended Disclosure that "[t]he second agreement was signed after the petition was filed."  UST Ex. 6 at 1 ¶ 7(b).

In addition, instead of saying that he has agreed to "accept" $3,035 as a fee, Mr. Sisson states that "Debtor has agreed to pay" that amount.  *Id.* ¶ 1.  Mr. Sisson did not know the reason for this change, which was based on Fresh Start's updated form.  Tr. at 42, 109, 136-37.

Mr. Sisson also revised his description of his line of credit agreement.  *See* UST Exs. 3 at 12, Ex. 5.  Mr. Sisson states that the line of credit is "secured by (among other things)[3] a collateral assignment of the accounts receivable of counsel, including amounts" owed by Ms. Milner, UST Ex. 6 at 1 ¶ 8, and that his "obligation to repay this indebtedness is not contingent upon receipt of payment from" Ms. Milner.  *Id.*  Mr. Sisson further states the lender "will collect installment payments from" Ms. Milner "on behalf of" Mr. Sisson and will apply those payments to Mr. Sisson's debt to the lender. *Id.*; *compare* UST Ex. 3 at 1 ¶ 4.

Mr. Sisson still did not disclose that Fresh Start was entitled to 25% of the post-

---

[3] The line of credit agreement does not reflect any collateral other than the receivables. *See* UST Ex. 7 ¶ 2.4.

petition fee, that it can pursue collection actions directly against Ms. Milner, or that Mr. Sisson would have moved to withdraw if Ms. Milner had not entered the Post-Petition Contract. *See* UST Ex. 6.

### 5.      Ms. Milner's Bankruptcy Case Is Straightforward.

Mr. Sisson filed Ms. Milner's bankruptcy petition the same day that she returned to his office with the signed Pre-Petition Contract, April 17, 2019. UST Ex. 3; Tr. at 23. The petition was a "bare bones" petition that included minimal documentation. Tr. at 23. Mr. Sisson filed the remaining documentation necessary to obtain Ms. Milner's discharge less than two weeks later, on April 30, 2019. UST Ex. 4; Tr. at 27. Other than the garnishment that led to the initial filing on an emergency basis, which is not unusual, Ms. Milner's case was straightforward. Tr. at 41-42, 98.

### C.      The United States Trustee Seeks Court Review of Mr. Sisson's Fee.

On August 2, 2019, the United States Trustee[4] filed a motion asking the bankruptcy court to review Mr. Sisson's compensation under 11 U.S.C. §§ 329 and 526.

In response, Mr. Sisson provided a self-styled "Pre- and Post-Petition Fee Calculator," UST Ex. 2 at 24, which Mr. Sisson described as a "lodestar" analysis of his fees, Appellant's Br. at 24. Mr. Sisson testified that his "Fee Calculator" projects what the "ceiling" of fees would be "for all the various matters" that could happen in a chapter 7 case. Tr. at 51-53, 157. The analysis estimates that the bankruptcy filing would be $900, and that post-petition work would be $3,100, for a total of $4,000. UST Ex. 2 at

---

[4] United States Trustees are officials of the United States Department of Justice appointed by the Attorney General to supervise the administration of bankruptcy cases. 28 U.S.C. §§ 581-589. They "may raise and may appear and be heard on any issue in any case or proceeding under this title," 11 U.S.C. § 307, including asking the court to determine whether a debtor's attorney's fees are excessive, Fed. R. Bankr. P. 2017.

24.  Mr. Sisson did not base this analysis on Ms. Milner's case and it does not reflect his work on it.  Tr. at 111-14, 157-62.  In Ms. Milner's case, Mr. Sisson testified that he believed $300 was the reasonable value of his pre-petition services, Tr. at 37, and most of the post-petition work listed on the "Fee Calculator" was not required.  Tr. at 113-14. Mr. Sisson prepared the "Fee Calculator" after he had completed Ms. Milner's case and specifically in response to the United States Trustee's motion.  Tr. at 113-14, 160.

Mr. Sisson testified that despite the $4,000 fee total in his "Fee Calculator," he charges an $1,800 pre-paid flat fee because much of his competition charges $1,000 or $1,200, and the average rate is about $1,200 to $1,400.  Tr. at 60, 67.  He testified that he charges more for a bifurcated agreement because it creates more work.  Tr. at 60.

At the hearing on the motion, Mr. Sisson submitted invoices for Ms. Milner's case showing a total balance of $2,079.15, including the $335 filing fee, Sisson Exs. 4-6; less that fee, the total would be $1,744.15.  These invoices were not issued to Ms. Milner but were typical of what Mr. Sisson used to track his time.  Tr. at 56.  Mr. Sisson testified that the invoices omitted about an hour of his time and a half hour of his legal assistant's time spent on the garnishment, totaling about $350.  Tr. at 56-58.  The invoices also omitted an expense of about $25 for a financial management course.  Tr. at 58.

### D.  After Conducting an Evidentiary Hearing, the Bankruptcy Court Reduces Mr. Sisson's Fee by $800—to $1,900.

After an evidentiary hearing, the bankruptcy court held that both the Pre- and Post-Petition Contracts are void.  Op. at 46.  The court directed Ms. Milner to make one more $200 payment and held that no further payments are due.  *Id*.[5]  Together with the $300

---

[5] The United States Trustee's position is that Mr. Sisson should not have been permitted to keep any portion of the fees once the bankruptcy court voided the fee agreements, but she has not appealed the court's decision to merely reduce the fee.

paid pre-petition, plus $200 per month from May 2019 through this last payment in December 2019, Ms. Milner paid a total attorney fee of $1,900.

The bankruptcy court concluded that Mr. Sisson's "testimony and evidence were not credible with respect to": (1) his motivation for using Fresh Start; (2) the costs to his clients of bifurcation or his use of Fresh Start; (3) the amount of extra work allegedly required by bifurcation; or (4) his "lodestar" calculation of the value of his legal services. Op. at 21.  The court noted that Mr. Sisson was the only witness; although he could have called Ms. Milner as a witness, he did not do so.  Op. at 14 n.10, 21, 28 n.17, 34 n.23.

Prior to reaching the statutory grounds for its decision, the court addressed Mr. Sisson's arguments about the propriety of bifurcated fee agreements in chapter 7 cases. Op. at 24-28.  The court opined that such agreements are not *per se* invalid, but rejected Mr. Sisson's argument that the agreements satisfied the test used by a Utah bankruptcy court in *In re Hazlett*, Case No. 16-30360, 2019 WL 1567751 (Bankr. D. Utah Apr. 10, 2019).[6]  Unlike the *Hazlett* court, the court below found that Mr. Sisson's bifurcated agreements were not in Ms. Milner's best interests because she did not have the means to make the post-petition fee payments.  Op. at 27.  In addition, the court found—unlike in *Hazlett*—that Mr. Sisson's disclosures were inadequate, it was unlikely Ms. Milner understood them, and the attorneys' fees were not reasonable.  *Id.* at 27-28.  In response to the supposed policy arguments that Mr. Sisson said supported his bifurcated fee structure, the bankruptcy court stated:  "While the policy and social issues are certainly compelling, this Court's role is to focus on the specific facts and applicable law in the case before it, and not to render a decision based on policy, which is instead within

---

[6] The United States Trustee does not concede that the *Hazlett* decision, which is not binding on this Court, sets out the appropriate test.

Congress' purview."  Op. at 3.

After addressing Mr. Sisson's policy arguments, the court turned to its three, independent statutory bases for its holding: (1) the unreasonableness of Mr. Sisson's fee under 11 U.S.C. § 329(b); (2) the inadequacy of Mr. Sisson's fee disclosures to the court under 11 U.S.C. § 329(a); and (3) the failure of his agreements to clearly disclose his services, fees and terms of payment under 11 U.S.C. § 528(a).

### 1.    The bankruptcy court found that Mr. Sisson did not establish his fees were reasonable.

The bankruptcy court found that Mr. Sisson did not demonstrate his fees were reasonable under 11 U.S.C. § 329(b), which authorizes the court to cancel a fee agreement or reduce attorney's fees if the fees "exceed[] the reasonable value" of the attorney's services.  11 U.S.C. § 329(b).  Op. at 36-40.  The court considered both the billing statements Mr. Sisson presented for his firm's work on Ms. Milner's case and his lodestar analysis (the "Fee Calculator"), but found both to be "less than credible."  *Id*. at 37, 39.  Mr. Sisson himself testified that the billing records were not accurate.  *Id*. at 39. And the evidence showed that his self-styled "Fee Calculator" included fees for services that Mr. Sisson either routinely excludes from his services or that are "exceedingly rare." *Id*. at 37 n.26.  In addition, his proposed lodestar analysis reflects $900 in pre-petition fees, but his billing statements for the case reflected only $360 in pre-petition fees.  *Id*. Likewise, the billing statements for the case reflected a fee total of $2,075.15, significantly less than his lodestar analysis's total of $4,000.  *Id*.  The court thus concluded that Mr. Sisson's proposed "lodestar analysis bears no resemblance whatsoever to the realities of his representation of Debtor."  *Id*.  The court's review of that lodestar analysis showed, however, that the services are exactly the same regardless

15

of which fee model is used, except for 0.8 hours of time for a second signing appointment for a bifurcated fee agreement.  Op. at 38.

The court also considered Mr. Sisson's testimony that the average flat fee in the area is $1,200 to $1,400 per case.  *Id*. at 39.  "So, Debtor, who supports four children and whose income is below the poverty level, paid Sisson $1,300 to $1,500 more than the average local rate for chapter 7 cases for the right to make post-petition payments for essentially the same services."  *Id*.  Mr. Sisson's charge for making post-petition payments was $900 to $1,200 more than his customary rates.  *Id*.  The court found that "[s]imple math reflects the egregious extent of the up-charge imposed on Debtor with inadequate disclosure—an upcharge of either 50% or 80%."  *Id*. at 35.

The court found that "[t]his up-charge is absurd."  *Id*.  The court found that Mr. Sisson "failed to present any compelling evidence justifying this excessive up-charge solely so that Debtor could pay the fees in installments over a year."  *Id*. at 40.  The court further found that this upcharge was not justified by additional work created by the bifurcated contract because, "at most, this would amount to another meeting to have the Post-Petition Contract signed, generating perhaps an additional fee of $300 for an hour of his time."  *Id*.  The court found that the upcharge, which Mr. Sisson testified was not interest, Tr. at 29, was "simply an unnecessary cost borne by a debtor to use the bifurcated contract model by way of Sisson's Fresh Start Line of Credit."  *Id*. at 35 n.25.

## 2. The bankruptcy court found that Mr. Sisson's required disclosures to the court were "incorrect and misleading."

The bankruptcy court found that Mr. Sisson's disclosures to the court were inadequate under 11 U.S.C. § 329(a) and Bankruptcy Rule 2016.  Op. at 28-35.  Section 329(a) requires debtors' attorneys to file a statement of compensation paid or agreed to be

paid and the source of the compensation.  Rule 2016(b) requires that statement to include "whether the attorney has shared or agreed to share compensation with any other entity" and "the particulars" of any such agreement.  Fed. R. Bankr. P. 2016(b).

The court found Mr. Sisson's disclosures were "inaccurate or at least misleading." Op. at 30.  First, the Initial and Amended Disclosures contained two different statements regarding the total amount of compensation.  The Initial Disclosure stated that *Mr. Sisson* "agreed to *accept* $3,035.00," whereas the Amended Disclosure stated that "*Debtor* has agreed to *pay* $3,035.00."  *Id.*  (emphases added).  The court found that the original disclosure was not accurate because Mr. Sisson was not in fact receiving $3,035.  Rather, he was receiving $2,435, and Fresh Start was receiving $600.  *Id.* at 31.

Second, the court found that Mr. Sisson did not disclose that he was sharing his compensation with Fresh Start because neither the Initial nor Amended Disclosure disclosed that Fresh Start would receive 25% of the fee.  *Id.*; Ex. 3 at 12-13; Ex. 6.

Third, the bankruptcy court found that the Initial and Amended Disclosures contained inconsistent statements regarding when the post-petition agreement was entered, rendering one of them inaccurate.  Op. at 32.  The Initial Disclosure contained past tense statements suggesting that the Post-Petition Contract had been entered prior to the April 17 filing of Ms. Milner's petition.  *Id.*  The Amended Disclosure, however, stated that the Post-Petition Contract was entered after the petition date.  *Id.*  The court thus found that one of these disclosures "is incorrect and misleading."  *Id.*

### 3.  The bankruptcy court found that Mr. Sisson's fee agreements did not comply with the Code's disclosure requirements.

Section 526(c)(1) of the Bankruptcy Code provides that a debt relief agency's contract with a debtor shall be void if it does not comply with the material requirements

of section 528.  Op. at 41-42, 46.  The court found that Mr. Sisson, as an attorney providing legal services to consumer debtors, is a "debt relief agency" within the scope of sections 526 and 528.  *See* 11 U.S.C. § 101(3), (12A) (defining a "debt relief agency" as including any person who provides bankruptcy assistance to certain consumer debtors in return for compensation, with some exceptions not applicable here).  The court explained that under section 528, there must be a written contract that "clearly and conspicuously explain[s] the services that will be provided to the debtor, the fees and costs for such services, and the terms of payment."  *Id*. at 41.  The bankruptcy court found that the Pre- and Post-Petition Contracts did not comply with section 528 because they "fall far short of the required clear and conspicuous explanation."  *Id*. at 43.

The Pre-Petition Contract provided that the post-petition fee "will be paid in weekly or bi-weekly, or monthly, or semi-monthly installments of totally [sic] $200.00 per month until paid in full."  UST Ex. 8 ¶ 4(a).  The Post-Petition Contract contained similar language. Ex. 9 ¶ 1.  The court found that this disclosure of the compensation terms was "extremely confusing."  Op. at 44.  In addition, the court found that "key components of the payment terms are noticeably missing," such as when the installment payments begin and to whom they are made.  *Id*.  The court found the only way to determine when the payments are to be made is to look to the Fresh Start Consent, which is not a contract signed by Mr. Sisson, as required by section 528(a)(1).  *Id*. at 44 n.29.

In addition, the court found that both contracts contain "'legalese' not easily understood by a layperson."  *Id*.  The "legalese" included disclosures regarding bifurcation, the exclusion of certain services, the Fresh Start line of credit and its impact on Ms. Milner's obligations, and the potential for conflicts of interest.  *Id*. at 44-45.  Even Mr. Sisson testified that it was unlikely that Ms. Milner understood the terms of the

agreements.  *Id*.  And Mr. Sisson's counsel, a principal of Fresh Start who provided the form contracts to Mr. Sisson, "admitted the contracts lacked clarity, resulting in the failure of most consumer debtors to understand them."  *Id*.

Finally, the court found that the agreements should have more clearly and concisely spelled out the fee options available, so that Ms. Milner could fully understand the incremental cost of selecting the bifurcated model and the fact that Fresh Start, not Mr. Sisson, was receiving $600 of the fee.  *Id*.  The court found that representations contained in the Pre-Petition Contract that Ms. Milner had the option of paying $1,800 up front, and that failing to pay the fees up front "creates more work and cost" for Mr. Sisson, "appear[] inconsistent with Sisson's actual practices."  *Id*. at 34.  The court found that for the bulk of his cases, Mr. Sisson charged $1,500, but that clear comparisons of the three fee options ($1,500, $1,800 pre-petition over time, and $2,700 pre- and post-petition payments) were not set out for Ms. Milner "to highlight the differences between what she will pay and what a debtor who can prepay will pay for the exact same services."  *Id*. at 34-35.  The court found that neither the contracts nor the Initial or Amended Disclosures "make apparent the gross discrepancy in treatment."  *Id*. at 35-36.

## SUMMARY OF THE ARGUMENT

This Court should affirm the bankruptcy court's order voiding the fee agreements and reducing Mr. Sisson's fee to $1,900.  The bankruptcy court had three independently sufficient reasons for its decision, any one of which alone is sufficient to affirm, and none of which was erroneous.

First, the bankruptcy court did not abuse its discretion in finding that Mr. Sisson's $2,700 fee was excessive and reducing that fee to $1,900.  The $2,700 fee was over $1,000 more than both what Mr. Sisson usually charged and the average fee in the local

market.  And the $1,900 fee allowed by the bankruptcy court was still hundreds of dollars more than both of those benchmarks, and more than the total fee reflected on Mr. Sisson's own billing records for Ms. Milner's case.

Second, the bankruptcy court did not clearly err in finding that Mr. Sisson's fee disclosures did not, as required, accurately disclose the amount and source of his compensation and whether that compensation would be shared.  Mr. Sisson's disclosures contained indisputably inaccurate and incomplete statements regarding when the fee agreements were entered and whom Ms. Milner was paying.  And they failed to disclose that Mr. Sisson was sharing 25% of his post-petition compensation with Fresh Start.

Third, the bankruptcy court did not clearly err in finding that Mr. Sisson's fee agreements did not clearly and conspicuously disclose his fees and charges, terms of payment, and the services he was agreeing to provide.  There is no dispute that the agreements use unexplained legal jargon, such as "adversary proceedings" and "contested matters," to describe excluded services.  Clear terms of payment are also lacking as the fee agreements do not state when Ms. Milner was required to start making her installment payments, to whom, or the frequency with which she was required to pay.  Nor do the agreements clearly and conspicuously explain what it meant for Ms. Milner that she was entering a "bifurcated" fee arrangement, including that 25% of her post-petition payments were being retained by Fresh Start.

## ARGUMENT

**I.  The Bankruptcy Court Did Not Abuse Its Discretion in Finding that Mr. Sisson's $2,700 Fee Was Unreasonable.**

The bankruptcy court did not abuse its discretion in concluding that Mr. Sisson did not meet his burden of proving that $2,700 was a reasonable fee.  Nor did the court abuse

its discretion in reducing the fee to $1,900, Op. at 46, UST Exs. 8-10—*more* than the total fee reflected on Mr. Sisson's own billing records, Sisson Exs. 4-6.

Whenever compensation paid (or to be paid) to a debtor's attorney "exceeds the reasonable value" of that attorney's services, the bankruptcy court may cancel the fee agreement or order the attorney to return some or all of the money the client has paid.  11 U.S.C. § 329(b).  "In authorizing bankruptcy courts to review and to reduce an attorney's fee under section 329(b), Congress clearly was attempting both to prevent overreaching by debtors' counsel and to preserve the assets of the bankruptcy estate for the benefit of creditors."  *In re Geraci*, 138 F.3d 314, 320 (7th Cir. 1998).

If an attorney's fee is challenged, the attorney bears the burden to prove its reasonableness.  *In re Comm. Fin. Servs.*, 427 F.3d at 811; *see also In re Geraci*, 138 F.3d at 318; *Snyder v. Dewoskin (In re Mahendra)*, 131 F.3d 750, 757 (8th Cir. 1997).

In determining the reasonableness of a chapter 7 attorney's fees, courts look by analogy to the factors considered for retention of professionals under 11 U.S.C. § 330. *See In re Geraci*, 138 F.3d at 318.  Under that section, "the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including": the time spent, the rates charged, whether the services were necessary or beneficial, whether the services were performed within a reasonable amount of time, the professional's qualifications, and whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in non-bankruptcy cases.  11 U.S.C. § 330(a)(3).  These factors are not exclusive, 11 U.S.C. § 102(3) (specifying that the word "including" is "not limiting"), and the trial court may consider all relevant factors when determining a fee's reasonableness.  As the Tenth Circuit has explained, courts take into account the above factors plus additional factors such as the

21

novelty and difficulty of the task, the requisite skill level, whether the case precluded other employment, whether the fee is contingent, time limitations, the amount of money involved, the results obtained, and the experience and ability of the professional. *In re Comm. Fin. Servs.*, 427 F.3d at 811.

When a fee is excessive, courts look to the customary compensation charged by comparably skilled practitioners to determine what fee should be awarded. *Id*. at 812-13. Bankruptcy courts possess "wide discretion" in awarding attorney compensation, so long as it is reasonable. *Id*. at 810.

In adjusting Mr. Sisson's fees, the court below did not abuse its discretion under section 329 by determining that Mr. Sisson did not sustain his burden to show that his $2,700 fee for a garden-variety chapter 7 case was reasonable. The record supports the court's finding. Mr. Sisson's own billing statements show total fees of only $1,744.15, *See* Sisson Exs. 4-6, Op. at 39; 11 U.S.C. § 330(a)(3)(A)-(B) (listing time spent and rate charged for services as factors to be considered); *In re Comm. Fin. Servs.*, 427 F.3d at 810 (same). Likewise, the $2,700 fee is significantly more than the $1,200-$1,400 customary compensation for chapter 7 cases charged by other attorneys in the area and the $1,500 typically charged by Mr. Sisson. *See* Op. at 39; *In re Comm. Fin. Servs.*, 427 F.3d at 812-13 (holding court should look to customary compensation charged by comparable practitioners in establishing reasonable attorney fee amount); *In re Geraci*, 138 F.3d at 319 (affirming reasonable fee determination where bankruptcy court "looked to comparable charges in the locale for this type of simple no-asset consumer case"). The court found that Mr. Sisson also failed to justify his $2,700 fee by failing to show that any additional work was required for bifurcation other than, possibly, an additional meeting to sign the Post-Petition Contract. Op. at 39-40.

Mr. Sisson complains that the court did not conduct a lodestar analysis. Appellant's Br. at 23-25. But, although courts look to section 330 by way of analogy, section 329 does not restrict a court to a lodestar analysis. And the record shows that the court considered the relevant legal factors and the evidence Mr. Sisson presented, Op. at 36-37, specifically including his "lodestar analysis" (his "Fee Calculator"). Op. at 37-38 & n.26. The court committed no clear error in finding that Mr. Sisson's post-hoc creation "bears no resemblance whatever to the realities of his representation of" Ms. Milner, Op. at 37 n.26, given that Mr. Sisson admitted that it was not based on either the actual hours spent, or actual services provided, in Ms. Milner's case. Tr. at 111-13, 157-62.

Having found Mr. Sisson's fee to be unreasonable, the court modestly reduced it from $2,700 to $1,900. Op. at 46. The record below belies any suggestion that the bankruptcy court abused its discretion in determining $1,900 to be a reasonable fee. The court's fee award is over $150 more than the fees reflected on Mr. Sisson's own billing statements, using his undiscounted hourly rate of $300 per hour. Sisson Exs. 4-6. It is $400 more than Mr. Sisson's most common fee of $1,500. Tr. at 120-21, 163, Op. at 4. And it is $500 to $700 more than the average billing rate in the area of $1,200-$1,400. Tr. at 60, 67. *See In re Mahendra*, 131 F.3d at 758 (affirming award of $1000 as reasonable fee for chapter 7 case considering its lack of complexity and customary fees in the community). The bankruptcy court did not exceed its discretion in reducing Mr. Sisson's fee to $1,900.

## II.   Alternatively, the Bankruptcy Court Did Not Clearly Err in Finding that Mr. Sisson's Disclosures Did Not Comply with Section 329 and Bankruptcy Rule 2016.

Section 329 of the Bankruptcy Code requires debtors' attorneys to file with the

court a "statement of compensation paid or agreed to be paid," if such agreement was made within a year prior to the bankruptcy filing, "for services rendered or to be rendered in contemplation of or in connection with the case." 11 U.S.C. § 329(a). In addition, the statement of compensation must include "the source of such compensation." *Id.* Rule 2016(b) requires that the statement of compensation include "whether the attorney has shared or agreed to share compensation with any other entity," as well as "the particulars of any such sharing or agreement to share by the attorney." Fed. R. Bankr. P. 2016(b).

The Bankruptcy Code's disclosure requirements are not merely aspirational, Appellant's Br. at 21, they are mandatory. *Turner v. Davis, Gillenwater & Lynch*, 4 F.3d 1556, 1565 (10th Cir. 1993); *Jensen v. United States Trustee (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 848 (B.A.P. 10th Cir. 1997). Attorneys must disclose "the precise nature of the fee agreement." *Neben v. Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 881 (9th Cir. 1995) (internal quotation marks omitted). These requirements enable the bankruptcy court to "scrutiniz[e] carefully the compensation to be paid to the debtor's attorney" in recognition of the fact that "the debtor is in a vulnerable position and is highly dependent on his attorney and therefore will be reluctant to object to the fees." *In re Smitty's Truck Stop, Inc.*, 210 B.R. at 848. Rule 2016's requirement to disclose fee sharing further enables this review, because when compensation is shared "there is incentive to adjust upward the compensation sought in order to offset any diminution to one's own share." *In re Winstar Comms., Inc.*, 378 B.R. 756, 760 (Bankr. D. Del. 2007) (internal quotation marks omitted). An attorney who fails to comply with the disclosure requirements of section 329—even if unintentionally and regardless of the reasonableness of his fees—forfeits any right to receive compensation. *Henderson v. Kisseberth (In re Kisseberth)*, 273 F.3d 714, 721

(6th Cir. 2001); *Turner*, 4 F.3d at 1565; *In re Smitty's Truck Stop, Inc.*, 210 B.R. at 848; *In re Stewart*, 583 B.R. 775, 782 (Bankr. W.D. Okla. 2018).  And a willful failure to disclose warrants denial of all fees.  *See Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 479 (6th Cir. 1996).

The bankruptcy court's ruling falls squarely within this body of law.  It committed no clear error in finding that Mr. Sisson did not accurately disclose (a) what was paid or agreed to be paid; (b) the source of that compensation, or (c) the sharing of his compensation with Fresh Start.  The record evidence supports these findings.

First, Mr. Sisson does not dispute the court's finding that the Initial Disclosure was not accurate because Mr. Sisson was actually receiving $2,435, not the stated $3,035, and Fresh Start was receiving $600.  Op. at 31.  Moreover, neither the Initial nor the Amended Disclosure satisfied Mr. Sisson's duty to disclose the source of his compensation: Fresh Start.  Although Ms. Milner was obligated to pay the agreed fees to Fresh Start, that does not excuse Mr. Sisson's failure to disclose that he was actually receiving the funds from Fresh Start.  *See In re Park-Helena Corp.*, 63 F.3d at 881 (holding it is not sufficient to "simply identify the ultimate owner of the funds").

Second, there is record support for the court's finding that Mr. Sisson did not comply with Rule 2016(b)'s requirement to disclose "the particulars" of any fee sharing agreement.  Fed. R. Bankr. P. 2016(b).  In both the Initial and the Amended Disclosure, Mr. Sisson failed to disclose that he was sharing his fees with Fresh Start.  UST Exs. 3, 6.  Instead, he stated—falsely—in both that he had not agreed to share his compensation.  *Id.* Mr. Sisson does not dispute that the bankruptcy court correctly found that neither the Initial nor the Amended Disclosure indicated that Fresh Start was entitled to retain 25% of the agreed post-petition compensation.  *Id.*  Indeed, neither Disclosure even identified

25

Fresh Start as the lender providing the line of credit described in those disclosures.  *Id.*

Mr. Sisson's unsupported assertion that the requirement to disclose fee sharing does not apply to chapter 7 cases, Appellant's Br. at 22, is incorrect.  Rule 2016 contains no such exception.  The Rule requires "*[e]very attorney for a debtor*" to disclose any fee sharing arrangement.  Fed. R. Bankr. P. 2016(b) (emphasis added).

Mr. Sisson also argues in footnote 6, once again without citing any authority, that his arrangement with Fresh Start was not fee sharing because, although he assigned the receivable from Ms. Milner as collateral for his line of credit, Mr. Sisson is liable "whether his clients pay or not."  Appellant's Br. at 22 n.6.  But this misses the point that Fresh Start keeps 25% of the post-petition fee.  Under the Post-Petition Contract, Ms. Milner pays Fresh Start, which then divvies up her fee payment between itself and Mr. Sisson.  This is the very definition of sharing.  *See In re Winstar Comms., Inc.*, 378 B.R. at 761 (holding that assignment of part of contingency fee constituted fee sharing, citing dictionary definition of "share" "as 1) 'to divide and distribute in shares: apportion . . . 3) to grant or give a share in . . . .'") (quoting Merriam–Webster Online *available at* http:// www.merriam-webster.com).  As in *Winstar*, Mr. Sisson's agreement with Fresh Start "indisputably 'apportions,'" *id*., 25% of his post-petition fee to Fresh Start.

Third, the Initial Disclosure was facially inaccurate in stating that Ms. Milner and Mr. Sisson already had "entered" a fee agreement for the post-petition representation of Ms. Milner.  *See* UST Ex. 3 at 12 ¶¶ 1, 5(a), (d).  They had not, if one accepts Mr. Sisson's representation that the Post-Petition Contract was actually signed post-petition.  Tr. at 22-23.

Thus, although Mr. Sisson devotes a considerable portion of his brief to arguing

26

that the Post-Petition Contract in fact was signed post-petition, Appellant's Br. at 8-15, nothing in the court's holding rests upon a contrary finding.  If the court had found that the Post-Petition Contract actually was entered pre-petition then not only would the contrary statements in the Amended Disclosure be inaccurate in violation of section 329, but Ms. Milner's debt for the $2,400 in post-petition fees would be discharged.  11 U.S.C. §§ 523, 727(b); *Hessinger & Assocs. v. U.S. Trustee (In re Biggar)*, 110 F.3d 685, 688 (9th Cir. 1997).  Despite the court's suspicions regarding the agreement dates, Op. at 14 n.10, it did not hold that the $2,400 debt was discharged as pre-petition debt, instead allowing Mr. Sisson to receive one last $200 installment payment.  Op. at 46.  Thus, even assuming the Post-Petition Contract was signed post-petition, it would not mean that any of the bankruptcy court's independent bases for its decision are clearly erroneous.

## III.        Alternatively, the Bankruptcy Court Did Not Clearly Err in Finding that the Fee Agreements Were Not Clear and Conspicuous.

The Bankruptcy Code requires debtor's attorneys to execute a written contract with the debtor that explains "clearly and conspicuously—(A) the services such agency will provide to such assisted person; and (B) the fees or charges for such services, and the terms of payment."[7]  11 U.S.C. § 528(a)(1).  Contracts that do not comply with this requirement "shall be void."  *Id.* § 526(c)(1).

Section 528(a) "requires debt relief agencies to disclose specific information about the bankruptcy process to consumer debtors whose frequent ignorance and confusion on that subject could otherwise subject them to easy deception." *Conn. Bar Ass'n v. U.S.*, 620 F.3d 81, 96 (2d Cir. 2009).  Thus, bankruptcy retainer agreements "are held to a

---

[7] Mr. Sisson does not dispute that as a bankruptcy attorney he qualifies as a "debt relief agency" subject to this requirement.  *See* Appellant's Br. at 15-18; *Milavetz, Gallop & Milavetz, P.A. v. U.S.*, 559 U.S. 229, 239 (2010).

higher standard than conventional contracts." *In re Rodriguez Perez*, No. 15-06593 (ESL), 2018 WL 3655656, at *10 (Bankr. D.P.R. July 31, 2018) (internal quotation marks omitted). This "high standard" includes "the duty to explain with clarity in the written contract the services to be provided and the fees or charges for such services." *Id.*

The bankruptcy court did not clearly err in finding that the Pre- and Post-Petition Contracts did not explain "clearly and conspicuously . . . the services [Mr. Sisson] will provide," "the fees or charges for such services, and the terms of payment." 11 U.S.C. § 528(a). The record supports the court's conclusion that the Pre- and Post-Petition Contracts "fall far short of the required clear and conspicuous explanation." Op. at 43.

A review of those documents shows the court below did not commit clear error in finding that the compensation terms were "extremely confusing." For example, the Pre-Petition Contract nebulously tells the client that payments "will be paid in weekly or bi-weekly, or monthly, or semi-monthly installments of totally [sic] $200.00 per month until paid in full." UST Ex. 8 ¶ 4(a); *see also* UST Ex. 9 ¶ 1 (containing similar language). Mr. Sisson claims that these terms are "understandable to an average consumer" but he is not the trier-of-fact. Nor does he cite evidence establishing they mean that Ms. Milner "can choose to pay [the $200 per month] weekly, bi-weekly, or bi-monthly." Appellant's Br. at 18. Given the contract's text, the bankruptcy court did not clearly err in finding that this statement was not "clear and conspicuous," 11 U.S.C. § 528(a), especially as nothing in this language says what Mr. Sisson now claims it means: that Ms. Milner may choose when the payments would be made. Rather, as the court found, the only way to determine when the payments are to be made is to look to the Fresh Start Consent, which is not a contract signed by Mr. Sisson, as required by section 528(a)(1). *Id.* at 44 n.29.

Likewise, the contracts themselves show that, as the bankruptcy court found, "key

components of the payment terms," such as when Ms. Milner would begin making installment payments and to whom, are "noticeably missing."  Exs. 8, 9; Op. at 44.  Mr. Sisson does not dispute that the contracts omit these terms.

The record also supports the court's conclusion that the contracts contain "'legalese' not easily understood by a layperson," including the contracts' discussion of "bifurcating" the case, the exclusion of "adversary proceedings" and "contested matters," the impact of Fresh Start's line of credit on Ms. Milner's obligations, and the possibility of conflicts of interest.  Op. at 44-45; Ex. 8 ¶¶ 1, 4(a), 4(c), 5, Ex. 9 ¶¶ 1, 2.  In light of this legalese, the court did not clearly err in concluding that Pre- and Post-Petition Contracts are not "plain English" contracts as required by section 528(a).  Op. at 45.

Mr. Sisson argues that "[n]one of these issues have anything to do with 'the services that will be provided to the debtor, the fees and costs for such services, and the terms of payment.'"  Appellant's Br. at 18 (quoting *In re Rodriguez Perez*, 2018 WL 3655656, at *7).  This assertion is facially incorrect.  The fact that the fee agreements exclude certain services, such as adversary proceedings and contested matters, relates directly to the services to be provided and what the flat fee includes.  *See In re Seare,* 515 B.R. 599, 614, 621 (B.A.P. 9th Cir. 2014) (affirming holding that a "Retainer Agreement did not 'clearly and conspicuously' explain the scope of services and fees" because it "excluded services using technical terms like 'nondischargeability allegation' and 'adversary proceedings,' which a layperson would not likely understand"); *In re Rodriguez Perez*, 2018 WL 3655656, at *11 ("A contract listing excluded services in technical terms, and that does not relate these services to a client's particular case, fails the 'clear and conspicuous' requirement of a contract pursuant to section 528."). Likewise, the Fresh Start arrangement impacted Ms. Milner's fees and costs by

increasing them by at least $600, obligating her to pay Fresh Start directly, and subjecting her to potential collection actions by Fresh Start.  Indeed, the bankruptcy court found that the contracts did not adequately disclose Ms. Milner's fee options, and did not clearly and conspicuously state that $600 of her increased fee for bifurcation was going to Fresh Start, not Mr. Sisson.  Op. at 45.

Mr. Sisson attempts to brush aside his obligations under the Bankruptcy Code and Rules by asserting that consumers are "legally expected to understand" documents "at least as (and in many instances, much more) complicated than" these contracts. Appellant's Br. at 16.  But this argument ignores the standard for bankruptcy fee agreements imposed by the Code's explicit requirement they provide "clear[] and conspicuous[]" explanations.  11 U.S.C. § 528(a); *In re Robinson*, 368 B.R. 492, 501-02 (Bankr. E.D. Va. 2007); *Rodriguez Perez*, 2018 WL 3655656, at *10, *12 ("[T]he necessity of a 'thorough examination' of the contract is incompatible with the clear and conspicuous language required by § 528.").

Mr. Sisson also claims the bankruptcy court erred by drawing an adverse inference from Ms. Milner's absence at the hearing.  Appellant's Br. at 15.  Mr. Sisson cites no authority for this claimed error.  More importantly, nothing in the bankruptcy court's decision depends upon an adverse inference from the absence of Ms. Milner's testimony, as the documents themselves support the court's conclusion that they were not clear and conspicuous.

## CONCLUSION

For these reasons, the Court should affirm the order entered below.

March 10, 2020                          Respectfully submitted,

                                        ILENE J. LASHINSKY
                                        United States Trustee for Region 20

                                        By /s/   *Beth A. Levene*
                                                Beth A. Levene
                                                Trial Attorney


RAMONA D. ELLIOTT                       ILENE J. LASHINSKY
Deputy Director/General Counsel         United States Trustee for Region 20
P. MATTHEW SUTKO                        CHARLES S. GLIDEWELL
Associate General Counsel               Assistant United States Trustee
BETH A. LEVENE                          MARJORIE CREASEY
Trial Attorney                          Trial Attorney


Department of Justice                   Department of Justice
Executive Office for                    Office of the United States Trustee
  United States Trustees                215 Dean A. McGee Ave., Room 408
441 G Street, NW,                       Oklahoma City, OK 73012
Suite 6150                              Tel: 405-231-4393
Washington, DC 20530                    E-mail: marjorie.creasey@usdoj.gov
Tel: (202) 307-1399
E-mail: beth.a.levene@usdoj.gov

31

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing brief complies with the type-volume limitations set forth in Federal Bankruptcy Rule 8015(a)(7)(B) in that the brief contains 9,717 words as counted by Microsoft Word.  I further certify that the foregoing brief uses 13-point Times New Roman font, in conformity with Local Rule 7.1(d).


/s/ *Beth A. Levene*
Beth A. Levene
Trial Attorney

## CERTIFICATE OF SERVICE

I certify that on March 10, 2020, I filed and caused to be served the foregoing
BRIEF OF APPELLEE, ILENE J. LASHINSKY, UNITED STATES TRUSTEE via the
CM/ECF Electronic Filing system on counsel for Appellant.


/s/ *Beth A. Levene*
Beth A. Levene
Trial Attorney