+

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| B. David Sisson, | ) | |
| | ) | |
| Appellant, | ) | Case No. 5:20-cv-00033-PRW |
| | ) | |
| v. | ) | |
| | ) | |
| United States Trustee, | ) | |
| | ) | |
| Appellee. | ) | |

### APPELLANT'S REPLY BRIEF

Appellant B. David Sisson ("Sisson" or "Appellant"), counsel to the debtor in the chapter 7 case from which this appeal is taken, by and through undersigned counsel, submits the following Reply Brief.

### INTRODUCTION

The UST's response brief is as notable for what it does not say, as for what it does. By narrowing the issues to three, the United States Trustee ("UST") abdicates on two of the issues identified by Appellant: first, that the bankruptcy court erred in concluding that debtor's post-petition engagement agreement was not actually signed after the chapter 7 case was filed; and, second, that the bankruptcy court erred in concluding that a bifurcated engagement was not in the best interest of debtor. As to these issues, Appellant rests on its original briefing and will not belabor the points addressed therein. This Court should reverse these two conclusions of the bankruptcy court.

Of the three, remaining issues, two rely solely on a determination of whether documents meet statutory standards—purely legal conclusions that the bankruptcy court simply got wrong and as to which this Court owes the bankruptcy court no deference. The third issue involves a conclusion that is dually flawed—the bankruptcy court failed to follow the accepted legal standard, and appears also to have made a completely false and baseless assumption, both of which are reversible errors subject to *de novo* review.

First, this Court must determine whether Appellant's engagement agreements meet the standard imposed by Section 528 of the Code. Second, this Court must determine whether Appellant's compensation disclosure meets the standard imposed by Section 329 of the Code. These are purely legal conclusions, as to which the bankruptcy court is accorded no deference. Each statute imposes a far simpler and more discrete set of requirements than the Decision suggests, and this Court should conclude that the documents indisputably meet those requirements.

The third and final issue concerns the reasonability of Appellant's fees. As noted in Appellant's opening brief, the lodestar test is universally accepted in the federal court system as the standard for making this determination, and the bankruptcy court inarguably failed to apply that controlling standard. This alone merits reversal of the bankruptcy court's conclusion that Appellant's fees were unreasonable.

But the UST's framing of this issue also, ironically, illustrates another fatal flaw in the bankruptcy court's treatment of this issue. The UST tries to minimize the perceived impact of the bankruptcy court's decision by positing that the bankruptcy court only reduced Appellant's fee from $2,700 to $1,900—and suggests that this clearly is in the range of the court's discretion. The amount of Appellant's *agreed* fee, $2,700, is not in dispute. And it also is

undisputed that this fee was to be paid in post-petition installments. But in suggesting that the bankruptcy court allowed Appellant's fee in the amount of $1,900, the UST appears to assume that debtor had made all of her scheduled installment payments up to the date of the decision. Unfortunately, there is absolutely no record of that fact.[1] Without specifying the amount of fees that the bankruptcy court found to be reasonable, the Decision simply provides that "Debtor is directed to make one final payment to Sisson (not to Fresh Start) of $200.00 on or before December 20, 2019. Thereafter, no further attorney fee payments are due from Debtor to either Sisson or Fresh Start." Decision at 46. This second error likely flows from the first: Had the bankruptcy court done a lodestar analysis, there would be a conclusion about the amount of fees that are reasonable, which would then prompt an inquiry into what had already been paid. There is literally no conclusion in the Decision as to the amount of fees that would be reasonable, and no finding of what had been paid, leaving it impossible to determine the true impact of the order to "make one final payment . . . of $200.00." Thus, by making the baseless assumption that the bankruptcy court "only" reduced Appellant's fee to $1,900, the UST illustrates the lack of sufficient basis to uphold the bankruptcy court's Decision.

## LEGAL ANALYSIS

**A. Appellant's Engagement Agreements Meet the Minimum Standards Imposed by Section 528 as a Matter of Law.**

As Appellant already has noted, Section 528's applicable provision actually is quite narrow and simple, and requires only that a bankruptcy attorney "execute a written

---

[1] And, in point of fact, she had not. While Appellant certainly understands the nature of appeals and that this is not a factual proceeding, the absence of a record below on this issue compels disclosing this fact, if for no other reason than to illustrate the lack of foundation for the bankruptcy court's conclusion.

contract…that explains clearly and conspicuously…(A) the services that will be provided…[and] (B) the fees or charges for such services, and the terms of payment." 11 U.S.C. § 528 (a)(1); see also In re Rodriguez Perez, 2018 Westlaw 3655656 at *7 (Bankr. D. P.R. 2018).

The Pre-Petition Agreement explains "Payment and Filing Options" in paragraph 1, which also discloses the higher fee if the client chooses not to prepay for the entire engagement. It goes on in paragraph 2 to identify all of the services that Appellant will provide pre-petition if the client chooses to split the engagement in order to make post-petition installment payments of the attorney fee. It further explains, in paragraph 4, the options that the debtor will have to complete the case, and enumerates exactly what services will be provided post-petition if the debtor signs the separate, post-petition agreement. This list of services is reiterated in the Post-Petition Agreement in paragraph 1. As to payment terms, the Pre-Petition Agreement explains the maximum payment term and different options for payment frequency in paragraph 4(a), and the Post-Petition Agreement parallels this exact disclosure in paragraph 1.

This Court need look no further than these simple provisions in the Pre-Petition Agreement and Post-Petition Agreement to conclude that they "clearly and conspicuously explain the services that will be provided to the debtor, the fees and costs for such services, and the terms of payment." In re Rodriguez Perez, 2018 Westlaw 3655656 at *7 (Bankr. D. P.R. 2018). The bankruptcy court's remaining criticisms about the agreements are superfluous to determining whether the agreements meet Section 528's basic requirements.

B. **Appellant's Compensation Disclosures Meet the Minimum Standards Imposed by Section 329 as a Matter of Law.**

Like the analysis of Section 528, the bankruptcy court unnecessarily and improperly complicates the Section 329 analysis with superfluous criticism. Section 329's standard also is quite simple and straight-forward, and requires only "a statement of the compensation paid or agreed to be paid . . . and the source of such compensation." 11 U.S.C. §329(a). Sisson's disclosure lists his total fee plus the filing fee, the amount paid by the debtor before the case was filed, and the balance of $2400 due post-petition. See Amended Disclosure, UST Trial Exh. 6, ¶ 1. It indicates that the "source of compensation paid to me was" the debtor, id., ¶ 2, and that the "source of compensation to be paid to me is" also the debtor, id., ¶ 3.

The UST characterizes this last disclosure as "false" because the "true" source of the compensation was Fresh Start Funding, thus perpetuating the bankruptcy court's legal error that the arrangement between Appellant and Fresh Start Funding constitutes fee sharing. Borrowing from a third party against a receivable that is later paid by the debtor does not magically transform the lender into the debtor. The terms of Appellant's relationship with Fresh Start Funding are in the record, are undisputed, and their improper characterization by the bankruptcy court is a legal conclusion that is reviewable by this Court *de novo*.

It is a misunderstanding to suggest that Lender's program constitutes "fee sharing" insofar as Appellant's fee to Fresh Start Funding is calculated as a percentage of the value of the fee receivable. Fresh Start Funding provides a recourse line of credit the repayment of which is secured by a collateral assignment of Appellant's fee receivables, and the repayment of that debt is due from Appellant whether clients pay or not. This is not fee sharing; it is, instead, no different than a line of credit from a traditional bank that is secured by a firm's

account receivables, and the law is settled that such financing arrangements do not constitute fee sharing.

One case widely cited in other cases reviewing financing and the Rules of Professional Conduct is <u>PNC Bank, Del. v. Berg</u>, No. 94C-09-208-WTQ (Del. Super. Ct. Jan. 21, 1997). In that case the court rejected the notion "that it is 'inappropriate' for a lender to have a security interest in an attorney's contract rights."  The court noted that "it is routine practice for lenders to take security interests in the contract rights of other business enterprises," and said "there is no valid reason why a law firm should be treated differently than an accounting firm or a construction firm." The court acknowledged the potential applicability of Rule 5.4(a) of the Rules of Professional Conduct, but added:

> [T]here is no real "ethical" difference whether the security interest is in contract rights (fees not yet earned) or accounts receivable (fees earned) in so far as [Rule 5.4] is concerned. It does not seem to this Court that we can claim for our profession, under the guise of ethics, an insulation from creditors to which others are not entitled.

Taken literally, any obligation that a law firm pays from its operating account – including employee salaries, insurance premiums, rent, and bar dues –is paid with legal fees, because that is a law firm's source of revenue. As explained in footnote 9 of NYCBA Op. 2018-5:

> This opinion does not read Rule 5.4(a) to forbid funding arrangements in which the lawyer's debt obligation is secured by current or future accounts receivable but repayment is not contingent on the receipt or amount of fees. For example, a recourse debt that is not contingent on the amount of legal fees – e.g., a promise to repay a loan with interest over a particular period of time – does not constitute impermissible fee sharing simply because the debt is secured by accounts receivable in one or more matters. In the case of a recourse loan, there is no implicit or explicit understanding that the debt will be repaid only if legal fees are obtained in particular matters, and the creditor may seek repayment out of all of the law firm's assets. Nor do we believe the fee-sharing rule forbids funding arrangements in which the timing of the lawyer's payments

is determined by the resolution of a matter – e.g., where the lawyer's payment obligation does not begin until a matter is resolved – but the amount of lawyer's payment obligation does not itself depend on whether, or in what amount, legal fees are obtained.

This is precisely the type of loan provided by Fresh Start Funding: Appellant must repay his line of credit regardless of what he eventually receives in fees from his clients, and Fresh Start Funding's fee is not contingent on Appellant's recoveries.

Consequently, the bankruptcy court's conflation of Appellant's line of credit with his fee payments from the debtor is reversible error. Applying this legal distinction to Appellant's Amended Disclosure, the source of the compensation to be paid was, clearly, the debtor. The fact that Appellant was able to borrow against the receivable in the interim is a wholly unrelated circumstance that has nothing to do with his compensation disclosure. Appellant's Amended Disclosure is true, and it meets the simple requirements of Section 329.

**C. The Bankruptcy Court Failed to Employ the Lodestar Test, and Left This Court without a Conclusion about Reasonableness That Can Be Meaningfully Reviewed.**

The Supreme Court has strongly embraced the lodestar standard for determining a reasonable attorney fee precisely because it "is readily administrable," and "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." Perdue v. Kenny A., 559 U.S. 542, 130 S.Ct. 1662, 1672 (2010). In order to conduct a lodestar analysis, a trial judge must determine "the prevailing market rates in the relevant community," because the test was "[d]eveloped after the practice of hourly billing had become widespread." Id. The lodestar method thus produces an award that an "attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." Id.

As noted in Appellant's opening brief, the bankruptcy court conducted no such analysis. Rather, all of the bankruptcy court's attention was focused on the differential between Sisson's pre-paid flat fee, and his pay-over-time flat fee. See, e.g., Decision at 37-38. There is no reference point established for a prevailing market hourly rate, no reference point established for a reasonable amount of time to complete the representation, and consequently no way for this Court to meaningfully review the bankruptcy court's decision. There is, in fact, no conclusion at all about what a reasonable fee would be.

Instead (and, perhaps as a consequence), there is an order that the debtor only pay $200 more to Appellant, begging the question: $200 more than *what*? The UST baselessly infers from the Decision that what the bankruptcy judge *meant* to do was to determine that $1,900 is a reasonable fee. The problems with this faulty inference are multiple:

- First and foremost, the bankruptcy court never actually concludes this; nor can this conclusion be deduced from anything actually written in the Decision.

- Even assuming that this was the intention, upon what hourly rate is this conclusion based?

- Likewise, if this was the intention, how many hours would be appropriate for what the bankruptcy court also determined were "actual legal services" that "appear to have been reasonable and necessary and resulted in a satisfactory result for Debtor"? See Decision at 46, n. 32.

- And, finally, even supposing that the judge meant to conclude that $1,900 was a reasonable fee, how much had the debtor actually paid of this amount, such that an additional payment of $200 satisfied the balance?

To put it simply, the bankruptcy court failed to employ the appropriate legal standard and lacked an evidentiary foundation to conclude the exercise even if she had. This Court must reverse the bankruptcy court's conclusion that Appellant's fees were unreasonable.

## CONCLUSION

Appellant helped a debtor access relief through a bankruptcy filing when she could not otherwise have afforded counsel. He provided competent service and obtained a satisfactory result. He satisfied his statutory obligations to disclose the scope of his services, his fee and payment terms to the debtor. He likewise satisfied his statutory obligation to inform the bankruptcy court of his fee and the source of payment.

The bankruptcy court's Decision is unsupportable. Perhaps recognizing this, the UST has impliedly conceded that there is no basis to conclude that Appellant falsified documents and perjured himself concerning the timing of the Post-Petition Agreement's signing. Likewise, the UST chooses not to engage on the question of the debtor's best interest being served by Appellant's provision of post-petition payment terms.

As to the rest, this Court's review is *de novo*. The engagement agreements satisfy Section 528 and Appellant's compensation disclosure satisfies Section 329. These are legal conclusions that do not involve any deference to the bankruptcy court. Finally, there can be no question that the bankruptcy court failed to employ the controlling legal standard concerning reasonability of fees, and in its absence reaches a conclusion that cannot be understood, let alone upheld.

For all of these reasons, this Court should reverse the bankruptcy court's Decision, instruct the bankruptcy court as to the standard to employ to determine reasonableness of Appellant's fee, and remand on that issue alone.

RESPECTFULLY SUBMITTED this 1st day of May, 2020,

/s/ Daniel E. Garrison
Daniel E. Garrison, AZ Bar 021495
Admitted *pro hac vice*
Protego Law, PLLC
1805 N. Scottsdale Rd., Ste. 100
Tempe, AZ 85281
Tel: (480) 504-6840
dan@protegolaw.com

*Counsel for Appellant*

# CERTIFICATE OF SERVICE

I certify that on the 1st day of May, 2020
a copy of the foregoing was served via email upon:

Beth A. Levene, Trial Attorney
U.S. Dept. of Justice
Executive Office of the United States Trustee
441 G. Street, NW, Suite 6150
Washington, DC 20530
beth.a.levene@usdoj.gov

/s/ Daniel E. Garrison